IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

J.C., [1]

      Plaintiff,

v.                                  Civil Action No.  4:20-cv-283

UNITED STATES OF AMERICA;
OFFICER JIMMY HIGHSMITH;
WARDEN T.A. JONES;
WARDEN CRAIG COIL;
SIS OFFICER RONALD PROFFITT;
OFFICER GEOFFREY BROWN;
OFFICER MANUEL PULIDO;
and
NAKAMOTO GROUP, INC.

      Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, J.C, by and through her attorneys, brings claims based upon the Eighth Amendment to the United States Constitution pursuant to the legal standards set forth in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2D 619 (1971), based upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* and/or other applicable law.

1.     J.C., while an inmate in the custody of the Federal Bureau of Prisons ("BOP")**,** endured two brutal rapes and other forms of sexual abuse. J.C. was sexually battered by Officer Jimmy Highsmith ("Highsmith") and sustained damages as a proximate result.

---

[1] These initials, and all initialized references to inmate victims of sexual assault at FCI Tallahassee, are pseudonyms used to protect the subject's identities for personal safety reasons. These persons have legitimate fears of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

2.      J.C. brings this suit to recover for the violation of her constitutional rights and for the negligent acts of the BOP employees named herein, who failed in their duty to protect her from the known risk that Highsmith posed to her and to all inmates confined at FCI Tallahassee.

3.      J.C. brings this suit for damages against Nakamoto Group, Inc., as a third-party beneficiary to the contract between defendants U.S.A. and Nakamoto Group, Inc. Nakamoto Group, Inc. was contractually obliged to provide Prison Rape Elimination Act (PREA) audits to assist the Bureau of Prisons in identifying and addressing the various factors that contribute to inmates' risk of being sexually abused and/or assaulted in each of the facilities it operates. Nakamoto Group, Inc. failed to conduct reasonable and appropriate audits under the contract, which was a proximate cause of the damages suffered by J.C.

4.      Defendant correctional employees working at FCI Tallahassee knew that Highsmith, as an individual, posed a threat to the safety of J.C. and all other inmates.

5.      Defendants Warden T.A. Jones ("Warden Jones" or "Jones"), Warden Craig Coil ("Warden Coil" or "Coil"), Special Investigative Services Officer Ronald Proffitt ("SIS Proffitt" or "Proffitt"), Officer Geoffrey Brown ("Officer Brown" or "Brown") and  Officer Manuel Pulido ("Officer Pulido" or "Pulido") were also aware that Highsmith posed a significant risk of sexual assault and sexual abuse to the inmate population at FCI Tallahassee, including and especially J.C.

6.      As a federal inmate, J.C. was committed to the Government's care, custody, and control and while in such custody federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the united states" and to "provide for the protection ... Of

all persons charged with or convicted of offenses against the united states." 18 U.S.C. § 4042(a)(2)-(3).

7.     As a federal inmate, J.C.'s options for escaping sexual assault or for resisting the sexually abusive conduct of a guard were limited. J.C.- like all inmates at FCI Tallahassee - relied on employees to protect her from sexual abuse by guards and staff.

8.     As a result of the harm sustained by her while she was an inmate at FCI Tallahassee, J.C. suffered injuries to include: physical harm sustained during two rapes that required hospitalization, and emotional harm to include the dignitary injury of being forced to endure sexual activity to which she did not consent, for which she had neither the legal nor volitional capacity to consent, and from which she had no lawful means of escape.

<u>**JURISDICTION AND VENUE**</u>

9.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the United States of America under the Federal Tort Claims Act (FTCA), 28 U.S.C. 2671, *et seq.* and against the individual Defendants under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).* The parties to this action are completely diverse as to citizenship and/or state of incorporation.

10.     Plaintiff has exhausted all obligatory administrative remedies as she filed an Administrative Claim (Form 95) on September 20, 2019, with the Federal Bureau of Prison's Southeast Regional Office. As the six-month time period has passed without

Plaintiff receiving a response denying her claim, her claim is considered denied and exhausted.

11.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all the events upon which this action is based occurred in the Northern District of Florida.

## PARTIES

### Plaintiff

12.     At all times material hereto, Plaintiff J.C. was a federal prisoner confined at FCI Tallahassee, in Tallahassee, Florida, which facility is within the Northern District of Florida.

### Defendants

13.     The United States of America is a sovereign entity named herein pursuant to the FTCA.

14.     Defendant the United States of America oversees the Federal Bureau of Prisons "Bureau" or "BOP", which is responsible for the custody and care of federal inmates.

15.     Federal Correctional Institute Tallahassee employs correctional officers, facilities staff and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen and paid by the BOP through the United States Department of Justice serving "investigative or law enforcement" functions.

16.     The conduct of Defendants Highsmith, Wardens Coil and Jones, SIS Proffitt, Officer Pulido, and Officer Brown, as complained of herein subjects the United

States of America to liability for improper actions committed within the course and scope of their employment.

17.     At all times relevant to this complaint, Highsmith was employed by the BOP as a Correctional Officer at FCI Tallahassee, in which capacity he was responsible for, among other things, maintaining security at FCI Tallahassee and for providing safekeeping, care, and protection of inmates incarcerated there, including J.C.

18.     Defendant Highsmith is a serial sexual abuser of BOP inmates. Highsmith's practice of raping inmates in FCI Tallahassee's custody has been documented, ignored, and/or covered up by the BOP and by officials and guards at FCI Tallahassee since at least 2014.

19.     Highsmith was a known sexual predator by the FCI Tallahassee Management Team and the Prison Investigative Agencies but he was allowed unrestricted and unsupervised access to female inmates.

20.     Highsmith engaged in the systematic sexual harassment, sexual abuse, and sexual assault of Plaintiff J.C.

21.     Warden T.A. Jones ("Warden Jones" or "Jones") was at all times relevant to this complaint, a BOP employee and, on information and belief, a Florida resident. Defendant Jones was Warden of FCI Tallahassee in 2014, in which capacity she had full administrative responsibility for the entire institution.

22.     As Warden, Jones had overall responsibility for facility-wide adherence to policies concerning sexually abusive behavior by FCI Tallahassee guards against inmates. As Warden, Jones was responsible for compliance with BOP and PREA-mandated standards. Jones was also responsible for supervising, training, and

disciplining correctional officers at FCI Tallahassee. Jones is named in both her official and individual capacities.

23.     Warden Coil was, at all times relevant to this complaint, a BOP employee and, on information and belief, a Florida resident. Defendant Coil was Warden of FCI Tallahassee in 2018 and 2019, in which capacity he had full administrative responsibility for the entire institution.

24.     As Warden, Coil had overall responsibility for facility-wide adherence to policies concerning sexually abusive behavior by FCI Tallahassee guards against inmates. As Warden, Coil was responsible for compliance with BOP, FPC and PREA-mandated standards. Coil was also responsible for supervising, training, and disciplining correctional officers at FCI Tallahassee. Coil is named in both his official and individual capacities.

25.     SIS Officer Proffitt ("Officer Proffitt" or "Proffitt") was responsible for, among other things, assisting the management team in providing safekeeping, care, and protection of inmates at FCI Tallahassee in his investigative capacity to report the information regarding the sexual misconduct of Highsmith.

26.     At all times relevant to this complaint, Correctional Officer Geoffrey Brown ("Officer Brown" or "Brown") was employed as a correctional officer at FCI Tallahassee and, on information and belief, is a Florida resident. At all times relevant to this complaint, Officer Brown was responsible for, among other things, providing safekeeping, care, and protection of inmates at FCI Tallahassee, including the Plaintiff. Officer Brown is named in his individual capacity.

27.     At all times relevant to this complaint, Correctional Officer Manuel Pulido ("Officer Pulido" or "Pulido") was employed as a correctional officer at FCI Tallahassee

and, on information and belief, is a Florida resident. At all times relevant to this complaint, Officer Pulido was responsible for, among other things, providing safekeeping, care, and protection of inmates at FCI Tallahassee, including the Plaintiff. Officer Pulido is named in his individual capacity.

28.     Defendant United States of America has various agencies including but not limited to the Office of Internal Affairs ("OIA"), the Office of Inspector General ("OIG"), the U.S. Department of Justice ("DOJ") and many other special agents and supervisory attorneys who are responsible for the investigation and prosecution of correctional officers sexually abusing inmates at federal institutions including FCI Tallahassee. These agencies failed to timely investigate and prosecute any of the criminal activity perpetrated by Officer Highsmith. SIS, OIA, OIG and DOJ are collectively referred to herein as the "Prison Investigative Agencies".

29.     All defendants above were, at all times relevant to this complaint, acting under color of law.

30.     Defendant Nakamoto Group, Inc. is a Delaware Corporation with its principal place of business in the State of Maryland.

31.     At all times relevant to this complaint, Nakamoto Group, Inc. (Nakamoto) was the auditor for inspecting, monitoring and oversight of BOP compliance with PREA standards at FCI Tallahassee.

32.     The BOP contracted with Nakamoto to carry out inspections of FCI Tallahassee in accordance with the standards mandated by PREA. Nakamoto was contractually obliged to carry out those inspections as part of the auditing process required by PREA for the benefit of all inmates in the custody of FCI Tallahassee.

33.     Nakamoto negligently performed the auditing functions under PREA and breached its contractual and/or other legal obligations as more specifically alleged below.

## FACTUAL BACKGROUND

34.     Highsmith was hired by the BOP in April 2007 at FCI Coleman, and later transferred to FCI Tallahassee in May 2010.

35.     Highsmith attended and completed the BOP's Correctional Training Program, Phases I (an introductory two-week course) and II (a three-week long course) and also received a week of specific training on how to supervise female offenders.  On information and belief, Highsmith has received annual refresher training every year forward beginning in 2008 which includes continuing education on the prohibition of sexual abuse of inmates.

36.     Many of the BOP's policies are contained in documents titled "program statements" which set forth rules and procedures that all BOP employees are required to follow.

### Program Statement 3420.11 – Standards of Employee Conduct

37.     Program Statement 3420.11 sets out the duties and responsibilities of all BOP employees. It requires that employees, "[A]s soon as practicable (but no later than 24 hours) report to their CEO (or other appropriate authority such as the Office of Internal Affairs or the Office of the Inspector General) any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or regulation. Every employee is required to immediately report to management any act or omission by any person that could result in a breach of institution security. Failure by employees

8

to follow these regulations and policy or any other Bureau policy or relevant regulation(s) could result in disciplinary action, up to and including removal."

38.     Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

39.     Program Statement 3420.11 states that BOP employees are subject to administrative action, up to an including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

40.     Program Statement 3420.11 goes on to state that "Title 18, U.S. Code Chapter 109A provides penalties of up to life imprisonment for sexual abuse of inmates where force is used or threatened. Sexual contact is defined as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person. All allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution".

41.     Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

42.     On November 10, 2014, Highsmith signed an acknowledgment that he received the updated version of Program Statement 3420.11.

43.     On information and belief, as BOP employees, Defendants Jones, Coil, Proffitt, Brown and Pulido, all similarly received and signed an acknowledgment of training for updated versions of Program Statement 3420.11.

44.     Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) concerning the prevention of, and intervention upon sexually abusive behavior, implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address prohibited and/or illegal sexually abusive behavior.

45.     Program Statement 5324.12 is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior. It is disseminated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

46.     Program Statement 5324.12 lays out duties and responsibilities with respect to conduct for all BOP employees, and mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment: it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

47.     BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

48.     Between January 21 and 24, 2014, Highsmith completed annual refresher training during which time he signed a training acknowledgment that he had received and understood the BOP's sexual abuse prevention and intervention program training.

49.     Inmates, employees, and the public may file a complaint at the BOP facility where an incident of sexual abuse occurred; through BOP's Office of Internal Affairs; or with the Department of Justice Office of Inspector General (OIG). In accordance with the agency's own Standards of Employee Conduct, BOP employees must report any violation of those Standards, or any rule or law within one business day of the incident to their Chief Executive Officer (CEO), OIA, or the OIG. Decisions regarding disciplinary action in cases where the allegations are sustained are managed by BOP's Human Resources Management (HRM) and BOP's Office of General Counsel.

## 2014 Rape of T.D. by Highsmith

50.     In 2014, the Office of Inspector General (OIG) received information from BOP Special Investigative Agent (SIA) Dan Clark alleging that on April 30, 2014, Highsmith sexually assaulted inmate T.D. inside the Officer's Station in C-Unit North of FCI Tallahassee.

51.     This report by SIA Dan Clark triggered a joint investigation between the OIG and the Federal Bureau of Investigation of the allegations involving Highsmith. OIG investigators interviewed six staff members, thirteen inmates (including the victim, T.D.), and Highsmith. OIG investigators reviewed surveillance video and medical records of the victim. Additionally, physical evidence, including articles of clothing belonging to the victim and a washcloth used by her, fabric from the desk chair in the officer's station used by Highsmith, swabs from the same desk chair, the telephone cord

in the officer's station, as well as a tampon, and vaginal and cervical swabs were collected as part of the OIG investigation. There was also evidence that he had sexually assaulted another inmate [name redacted].

52.     Of the Correctional Officers ("CO"s) and staff members interviewed by the OIG, none reported knowledge of Highsmith's alleged sexual assaults except for C.O. Alfred Brannan, who reported that when he arrived at work the morning of May 1, 2014 "[name redacted] told him that Highsmith had sexual intercourse with [T.D.]. [Name redacted] reported the incident to Counselor Manuel Pulido and Captain Roan McCullogh.

53.     In its investigative report, the OIG noted that Highsmith's denials of the incidents of sexual assault under investigation were not credible and constituted false statements to the OIG.  Highsmith's denials of the allegations were not credible because, among other things, his denials were inconsistent with the testimony of eyewitnesses and with the OIG's  review of video surveillance following the incident.

54.     The OIG also found that, "Highsmith failed to provide truthful information during his OIG interviews which also violated BOP PS 3420.11, Section 9 (Official Investigation) which states, '… During the course of an official investigation, employees are to cooperate fully by providing all pertinent information they may have.'"

55.     The OIG determined that a preponderance of the evidence demonstrated that Highsmith violated BOP Program Statement 3420.11 (Official Investigation) noting that "…[d]uring the course of an official investigation, …Full cooperation requires *truthfully* responding to questions…" (emphasis added)

56.    The OIG determined that that "...Highsmith likely sexually abused inmates White and [another inmate- name redacted]  in violation of BOP Program Statement (PS) Number 3420.11, Standards of Employee Conduct, Section 4 (General Policy) which states  '... Employees must endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards promulgated in this policy and the statutes .... ' and section 5B (Sexual Relationships/Contact With Inmates) which states' Employees may not allow themselves to show partiality toward, or become emotionally, physically, <u>sexually</u>, or financially involved with inmates ...'" (emphasis added)

57.    The OIG concluded that it "has completed its investigation and is providing this report to the BOP for appropriate action."

58.    The Chief of BOP's Office of Internal Affairs (OIA), forwarded the OIG's investigative report concerning the sexual assault of T.D. and a second unnamed inmate by Highsmith to Warden Jones. The cover letter to the OIG's report indicated that, "[b]ased on the OIG's findings," misconduct in the nature of an "Appearance of an Inappropriate Relationship" was "sustained" – requiring the Warden to "proceed with disciplinary or adverse action, and notify this [the Office of Internal Affairs] office of the action taken."

59.    The OIA's letter, along with the OIG's investigative report on Highsmith, were also forwarded to H.J. Marberry, who was at that time the Regional Director of BOP's Southeast Regional Office.

60.    Warden Jones was aware that the allegation of sexual assault against Highsmith was substantiated by the joint investigation of the OIG and the FBI, yet she did not seek to have Highsmith removed.

13

61.     Officer Pulido was aware that the allegation of sexual assault against Highsmith was substantiated by the joint investigation of the OIG and the FBI and he and participated in the employee grievance process, acting on behalf of Highsmith.

62.     Warden Jones decided that Highsmith's punishment should take the form of a 10 calendar-day suspension.

63.     Wardens Coil and Jones, as well as SIS Proffitt and Officer Pulido were aware that Highsmith had raped an inmate, T.D. in 2014.

64.     Warden Jones was aware that the OIG and the FBI had uncovered substantial evidence that Highsmith had sexually assaulted T.D. in 2014 and that he lied to investigators about the sexual assaults when he was later questioned.

65.     Warden Jones either failed to ensure that Highsmith's personnel record reflected that he had been the subject of a substantiated report of sexually abusive conduct against an inmate, or his records indicate this history and neither Warden Jones nor any of the other defendants took steps to prevent Highsmith from having unsupervised access to female inmates to whom he posed a clear risk of sexual abuse and sexual assault.

66.     Warden Coil failed to take appropriate steps to prevent Highsmith from having unsupervised access to female inmates to whom he posed a clear risk of sexual abuse and sexual assault.

67.     Officer Pulido was aware that Highsmith had a history of sexually abusing female inmates and was aware that Highsmith had raped inmate T.D. in 2014 and that Highsmith then lied to OIG investigators concerning the sexual assault.

68.     Officer Pulido failed to take appropriate steps to protect female inmates including J.C. and J.P. ( an inmate who is more particularly discussed herein below)

from being assaulted by Highsmith, despite that fact that, Pulido, as J.P.'s correctional counselor, would have been aware of the risk that Officer Highsmith posed to J.C. and to all female inmates.

69.     On January 30, 2017, T.D. filed a complaint in federal court in the Northern District of Florida, Case No. 17-CV-0005) against defendants U.S.A. and Highsmith, alleging, *inter alia* that she had been sexually assaulted by Highsmith.

70.     On March 7, 2017, J.C. entered FCI Tallahassee to serve a custodial sentence.

71.     As part of J.C.'s admission to FCI Tallahassee in March 2017, she received notice of BOP's purported zero tolerance policy regarding sexual abuse of inmates and the reporting of sexual abuse in an FCI Tallahassee Admission and Orientation Handbook and a Prison Rape Elimination Act (PREA) pamphlet.

72.     On January 11, 2018, Warden Jones' deposition was taken in Case No. 17-CV-00059.

73.     On February 22, 2018, Case No. 17-CV-00059 was settled for a considerable monetary amount and subsequently dismissed on the same day.

74.     In late June 2018, an inmate, J.P., was raped by Highsmith.

75.     On July 14, 2018, inmate J.P was brought to the Capital Regional Medical Center Emergency Room by Lt. King and another guard to be treated for injuries that resulted from being anally raped by Highsmith.

76.     This incident and Highsmith's involvement in it should have been known to Warden Coil, who had a duty to safeguard not only J.P. but all female inmates – including J.C. - from further sexual assault by Officer Highsmith.

77.     Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, § 115.65 "Coordinated Response," mandates that staff must report incidents of sexual abuse to the Operations Lieutenant, who is required to immediately safeguard the inmate.

78.     Program Statement 5324.12 also mandates that the Operations Lieutenant also ensures that the SIA/ and or SIS, Chief of Correctional Services, Institution PREA Compliance Manager, and Warden are notified of any incident of sexual abuse.

79.     On July 14, 2018, upon information and belief, Warden Coil was also independently notified of the incident by Capital Regional Medical Center Emergency Room Physician James Barr. After his examination of inmate J.P. for injuries sustained during the rape by Highsmith, Dr. Barr called FCI Tallahassee and demanded to speak to the Warden.

80.     Warden Coil did not take appropriate steps to prevent Highsmith from having access to female inmates pending the investigation of J.P.'s sexual assault. Nor did Warden Coil take appropriate steps to prevent Highsmith from having access to J.P. while she was housed in the SHU pending the investigation into Highsmith's sexual assault of J.P.

81.     Highsmith was assigned to guard J.P. in the SHU until sometime later when he was reassigned.

82.     Officer Brown, as Plaintiff J.C.'s correctional counselor, would have been aware of the risk that Highsmith posed to J.C. and to all female inmates, since it was Officer Brown who received information from J.P. in the weeks after her rape by Highsmith that she feared that an inmate, K.L. overheard J.P.'s reporting of her sexual assault to another inmate and planned to attack her at the direction of Highsmith.

83.     Officer Brown was required to report this information to the SIA or to the SIS Department or to the Warden. Instead, on information and belief, Officer Brown told J.P. that if K.T. "comes at you, may the best woman win."

84.     On information and belief, Officer Brown was in the vicinity of the guard's office during the first assault on Plaintiff J.C. and had witnessed the fact that Highsmith and J.C. were together alone and observed the demeanor of both.

85.     Additionally, Officer Brown had a duty, given what he knew based on the information given to him by J.P. that any contact between Highsmith in an area where he was unsupervised would be suspicious enough to trigger a duty upon Office Brown to report the incident under BOP policy and under the zero-tolerance policy mandated by PREA.

86.     Near the end of July 2018, Highsmith began a campaign of sexualized harassment against J.C. This pattern of conduct included Highsmith's paying an inordinate number of visits to her living area, paying extra attention to her, and unnecessarily getting physically close to her. This pattern of contact with J.C. worsened to the extent that Highsmith began openly leering at her while she was in her living area, in the main dining room, or while she was in transit from one area of the compound to another.

87.     Highsmith's sexual harassment of J.C. caused her to fear that she may be targeted by him for sexual assault and she attempted to keep her distance from him, including by avoiding leaving her living area – which was visible to a number of inmates – while he was on shift.

88.     On information and belief, Highsmith had primary supervisory responsibility for the D-Unit where J.C. was housed with dozens of other inmates - during his regular shifts.

89.     The D-Unit at FCI Tallahassee is an inmate dormitory with an adjoining office referred to as the "guard's office." Each "guard's office" is used by the guard on shift with primary supervisory responsibility for the housing unit.

90.     On information and belief, Highsmith was the only officer directly supervising D-Unit during his scheduled shift, and the "guard's office" was Highsmith's office, *de facto*, during those shifts when he was assigned to supervise D-Unit.

91.     At all times relevant to this complaint, the supervising officer on shift in D-Unit maintained control over, among other things, distribution of both internal administrative forms and menstrual hygiene products to inmates who requested them.

92.     In or about the middle of August of 2018, J.C. reported to the "guard's office" in D-Unit to request menstrual hygiene products and a form she needed in order to enroll in a class which was being offered to all inmates.

93.     When she appeared at the door to the guard's office, Highsmith approached J.C. and grabbed her jaw. Highsmith pulled J.C. toward him by her face with his one hand, with his thumb and forefinger forcefully digging into each of her cheeks. This caused J.C. significant physical pain.

94.     Highsmith physically pulled J.C.'s jaw toward his face and forcefully kissed her. She described this as being a violent and non-consensual form of kissing that was both painful and shocking. J.C. was surprised and began to shake. She attempted to free herself from his grip and as soon as she could break loose, she immediately returned to her bed in her area of the housing unit.

95.     Although J.C. feared that Highsmith planned to attack her again and/or sexually assault her, she did not report this incident because she was afraid of retaliation.

96.     Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program, §115.51 "Inmate Reporting")   provides that inmates are encouraged to report allegations of sexually abusive behavior to staff at all levels, including local, regional and Central Offices. But it does not provide for adequate protection from retaliation.

97.     On information and belief, around the time of this first physical battery by Highsmith against J.C., inmate S.P. was disciplined for arguing with Highsmith, and their conflict was based on S.P.'s observation of Highsmith's predatory behavior toward inmates and S.P.'s suspicion of sexually abusive behavior between Highsmith and inmate J.P.

98.     This disciplinary action should have spurred an investigation of the basis for the conflict between Highsmith and S.P.

99.     At the very least, this conflict between S.P. and Highsmith indicated that there were reasons for other members of staff, including the disciplinary hearing officer presiding over S.P.'s hearing, to be suspicious that Highsmith was engaging in sexually abusive conduct against inmates and/or was retaliating against inmates who dared to complain.

100.     As a result of the conflict between her and Highsmith, S.P. was detained in the Special Housing Unit (SHU) and was not returned to D-Unit on her release from SHU.

101.    The outcome of S.P.'s formal complaint against Highsmith made it plain to J.C. that making a complaint against Highsmith would cause her either to be detained in the SHU or to suffer different or worse forms of retaliation.

102.    In late August 2018, following the first battery of J.C. described above, Highsmith issued a verbal command ordering J.C. to come to his office.

103.    J.C., like every inmate at FCI Tallahassee, is required to follow the verbal command of any and every officer.  J.C. complied with Highsmith's order and walked toward his office, which is at the end of a corridor with a dead-end and a staff bathroom.

104.    Highsmith suddenly stood between J.C. and the open end of the hallway, blocking her in at the dead-end. J.C. had nowhere to turn around and Highsmith immediately unbuttoned her shirt and attempted to fondle her breasts.

105.    Highsmith shoved his hand down the front of J.C.'s pants over her underwear and grasped at her vulva.

106.    This assault was interrupted by the intercom announcement of "the move," a regularly scheduled designated ten-minute time period at the end of each hour wherein inmates are permitted to move from one area of the compound to another, or from one task or activity to another task or activity. J.C. managed to get away from Highsmith by insisting that he was not going to be able to guard "the move" if he did not let her go.

107.    This incident caused J.C.'s fear of Highsmith to worsen and at this time she disengaged from her regular social and educational activities at FCI Tallahassee. J.C. also attempted to escape Highsmith's notice during his shifts by sleeping in her bunk during the day, or by pretending that she was either sleeping or sick in order to avoid

being called to the guard's office by Highsmith and to avoid being isolated by him outside of her housing unit, away from the observation of other inmates.

108.    On the afternoon of September 13, 2018, J.C. was sleeping in her bunk when she was woken up by Highsmith. Highsmith told J.C. that she had to report to the guard's office. When J.C. asked why she had to go to the guard's office, Highsmith replied that "(Correctional Officer) Brown wants [to see] you". Another inmate, C. G. witnessed Highsmith grabbing J.C. by the arm and demanding that she go to the guard's office.

109.    At the end of the corridor, Highsmith pushed J.C. toward the staff bathroom and then shoved her inside. Highsmith then stood between her and the bathroom door to prevent her escape.

110.    Officer Highsmith physically attacked J.C. first by forcibly kissing her and then by grabbing her hair so hard that he was in control of her entire head and shaking her head by her hair such that wherever her head was yanked, her body followed.

111.    Highsmith used his hand-hold on her hair and head to shove J.C.'s head down where she stood, and he shoved his penis into her mouth in a single forceful motion. Highsmith pushed her head down repeatedly - and so violently that J.C. felt that she was choking and could not breathe.

112.    At this time, Correctional Officer Love approached the bathroom door and called Highsmith by his name. Highsmith continued to handle J.C. by a fist-full of her hair and he yanked her head up high enough to whisper to her to "shut the fuck up." J.C. was frozen in place and Highsmith did not move or make a sound.

113.    Highsmith shoved her hard, backwards, onto the toilet behind her and pulled her left pant leg off. Highsmith pulled J.C.'s left leg up by hooking his arm behind her knee and lifting her thigh up.

114.    While on his knees, Highsmith raped J.C. vaginally.  Highsmith had toilet paper wrapped around his hand and ejaculated into his hand into the toilet paper.

115.    Officer Love was still on the other side of the door and he started banging loudly on the door. Highsmith yelled that he would be out in a minute and started flushing the toilet repeatedly.

116.    Highsmith came out of the bathroom and was face-to-face with Officer Love, who had been standing outside throughout the incident. Highsmith and Love argued, with Officer Love telling Highsmith that they were "all going up" to the Lieutenant's office.

117.    Present in the Lieutenant's office when J.C. and Officers Love and Highsmith arrived were Special Investigative Services (SIS) Officers Harrold and Lieutenant Lynch. SIS Harrold took J.C. to the SHU immediately.

118.    For approximately one week, J.C. stayed in SHU and when Lieutenant Rivera came to see her she refused to give details of what had occurred because she feared retaliation, feared Highsmith, did not know where Highsmith was, and was worried that she would be indefinitely detained in SHU if she went through the process of reporting the sexual assaults.

119.    On Friday, September 21, 2018, J.C. sent a message through the internal email system to Lieutenant Rivera indicating that she was now ready to speak to investigators about the sexual assault. When she had not received a reply by the

following Monday, J.C. decided to attend "main line" at the main dining hall – which provides an opportunity for inmates to speak to FCI Tallahassee administrative staff.

120.    J.C. approached Warden Coil and SIS Officer Proffitt. J.C. gave a detailed statement to SIS Proffitt that day and was brought to the Capital Regional Medical Center Emergency Room shortly thereafter.

121.    Both Warden Coil and SIS Officer Proffitt were aware that this was the second time in two months that Highsmith had raped an inmate, and that J.C. was the second inmate – after J.P. - who had to be brought to the Capital Regional Medical Center Emergency Room because she had been raped by Highsmith.

122.    Upon information and belief, Highsmith continued to work at FCI Tallahassee after the sexual assaults described above and he continued to sexually assault female inmates until he was transferred to another BOP institution

123.    At least one of those inmates brought a complaint in this Court alleging that she had been sexually assaulted during the time period of June 28, 2018 to September 2018. *See, Wendy Kernechel vs. USA and Jimmy Highsmith*, 4:20-cv-00078.

124.    BOP officials at FCI Tallahassee, including Defendants Coil and Proffitt, knew that Highsmith had sexually abused J.P., J.C. and inmate Kernechel, yet failed to effectively discipline him or take any effective action to prevent him from continuing his abusive behavior or to protect other inmates.

125.    Both prior to and following Highsmith's sexual assaults of J.C., BOP officials at FCI Tallahassee and the Southeast Regional Office failed to comply with or ignored BOP policies which required the tracking and identifying employees who have engaged in sexually abusive behavior toward inmates.

23

126.    BOP Program Statement 5324.12, *Sexually Abusive Behavior Prevention and Intervention Program* § 115.71 "Criminal and administrative agency investigations requires that the records of such investigations be kept by the agency for "as long as the alleged abuser is incarcerated or employed by the agency, plus five years".

127.    FCI Tallahassee and the Office of Regional Counsel /Southeast Regional Office of the BOP had in their possession records pertaining to the administrative and criminal investigations into the 2014 sexual assault of T.D. by Highsmith.

128.    Officials at FCI Tallahassee also had the records from S.P.'s disciplinary hearing, arising from her conflict with Highsmith, during which S.P. accused Highsmith of sexually inappropriate conduct and of sexually abusing inmates.  Those officials failed to take action before J.C. was sexually assaulted and raped by Highsmith.

129.    That disciplinary investigation involving S.P. and Highsmith, had it been properly conducted, would have identified Highsmith as a clear and present risk to the safety of inmates and identified the specific risk that he posed to the inmate population as a sexual predator.

130.    Despite numerous facts indicating that Highsmith was a clear and present risk to the safety of inmates specifically the  risk that he posed to the inmate population as a sexual predator, the Defendants Warden T.A. Jones, Warden Craig Coil, SIS Officer Ronald Proffitt,  Officer Geoffrey Brown, and Officer Manuel Pulido and other fellow correctional officers ignored, condoned, and/or enabled his sexual misconduct.

131.    BOP Program Statement 5324.12, *Sexually Abusive Behavior Prevention and Intervention Program* § 115.17 Hiring and Promotion Decisions clearly prohibits the hiring or promotion of "anyone who may have contact with inmates, and shall not enlist the services of any contractor, who may have contact with inmates, who: (1) Has

24

engaged in sexual abuse in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution."

132.    On information and belief, contrary to BOP policy and the dictates of PREA, Highsmith was transferred in 2019 - with a promotion - to FCP Yazoo City Medium in Mississippi and continues to be employed by the BOP as a correctional officer.

133.    Nakamoto contractors conducted audits of FCI Tallahassee in June of 2015 and in March of 2018.

134.    The PREA audits conducted by Nakamoto were materially incomplete, as auditors failed to properly conduct required systematic reviews of documents held by FCI Tallahassee relating to sexual abuse and sexual harassment allegations over the prior 12 months at the facility; failed to properly interview inmates and/or staff that were involved in or witness to PREA violations by Highsmith or any other correctional officer.

135.    The failure of Nakamoto to conduct a thorough audit of FCI Tallahassee and investigate allegations of staff sexual misconduct allowed Highsmith to stay in his position and have unfettered access to inmates, including J.C., rather than facing termination from employment or removal from his duties at FCI Tallahassee.

### COUNT I
### Eighth Amendment: Sexual Abuse, Battery, Sexual Harassment (Officer Highsmith)

136.    J.C. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

137.    As an inmate in the custody of the BOP, J.C. had a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

138.    Sexual abuse by a guard is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate penal purpose.

139.    Highsmith violated J.C.'s rights by repeatedly assaulting her, using coercion to have sexual contact with her for his gratification, and sexually abusing her while she was incarcerated at FCI Tallahassee in August and September 2018.

140.    Highsmith, individually, failed in his duty to provide J.C. with constitutionally safe and secure conditions of confinement by subjecting her to sexual abuse, sexual assault, and battery.

141.    Highsmith acted intentionally, maliciously, and/or in reckless disregard of Plaintiff's statutory and common law rights, by sexually assaulting and raping her while she was incarcerated at FCI Tallahassee, despite knowing that severe emotional distress was certain to occur.

142.    As a direct and proximate result of Highsmith's sexual abuse and associated misconduct, J.C. was intentionally subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

143.    The conduct of Highsmith which proximately caused J.C.'s injuries was of such a quality and nature as to warrant Highsmith's liability for punitive damages, in accordance with applicable law.

144.    J.C. is entitled to recover from Highsmith all of her damages recognized by applicable law.

145.    All of Highsmith's acts and omissions were taken while acting under color of law and in the scope and course of his position as a senior Corrections Officer at FCI Tallahassee.

## COUNT II
### Eighth Amendment: Failure to Intervene, Deliberate Indifference
### (Defendants Jones, Coil, Proffitt, Brown and Pulido)

146.    J.C. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

147.    Defendants Warden T.A. Jones, Warden Craig Coil, SIS Officer Ronald Proffitt,  Officer Geoffrey Brown, and Officer Manuel Pulido (collectively referred to as Correctional Defendants) each owed a duty to J.C. while she was incarcerated at FCI Tallahassee to protect her.

148.    Warden Jones knew that Highsmith had sexually assaulted T.D. at FCI Tallahassee in 2014 in contravention of the BOP's Sexually Abusive Behavior Prevention and Intervention policy and Florida law.

149.    Warden Jones was also aware that Highsmith had provided false statements to OIG and FBI investigators in contravention of the Standards of Conduct.

150.    Warden Jones was aware that the OIG had investigated the rape of T.D. and found that the evidence of that conduct warranted referring the case to the United States Attorney for criminal prosecution.

151.    Warden Jones failed to appropriately discipline Highsmith for his sexual assault of inmate T.D.

152.    Warden Jones failed to ensure that the Regional Director and the Office of Internal Affairs were notified of the allegation involving Highsmith's sexual assault of T.D.

153.    The Office of the Regional Director had information concerning the allegations of Highsmith's sexually abusive conduct toward inmates when S.P. filed her administrative remedy request identifying Highsmith as an ongoing threat to the safety and security of the inmates at FCI Tallahassee.

154.    Despite such knowledge, Highsmith was not prevented from accessing female inmates, and he used that access to isolate at least two inmates in 2018 in the guard's office, where he raped them.

155.    Warden Coil was or should have been apprised of the incident involving J.P. in June of 2018.

156.    Warden Coil also had access to Highsmith's personnel file and other information from other sources revealing Highsmith's history of and proclivity toward committing sexual assaults against female inmates, including his sexual assault of T.D. in 2014.

157.    Officer Pulido as J.P.'s correctional counselor was aware, and the other Correctional Defendants either were aware or should have been aware, that J.P. had been brought to the hospital after having been sexually assaulted by Highsmith and were aware that she had been housed in SHU subsequent to and as a result of the sexual assault, supposedly so as to separate her from Highsmith; however, despite having knowledge that Highsmith had access to J.P. at SHU, defendants did not prevent him from being assigned to the SHU.

158.    Each of the Correctional Defendants, Wardens Jones and Coil, Officers Proffitt, Brown and Pulido, was deliberately indifferent to the risk faced by J.C. relative to Highsmith because each failed to take reasonable steps to address the danger that he posed to J.C. and to all inmates.

159.    In the face of this known risk to Plaintiff's safety, the deliberate indifference of the Correctional Defendants, who were responsible for the custody, care, safety, and "correctional treatment" of J.C., was a direct and proximate cause of the violation of J.C.'s rights under the United States Constitution and Plaintiff's resulting damages.

160.    The acts, omissions, policies, and practices of Wardens Jones and Coil and Officers Proffitt,  Brown, and Pulido constituted a knowing violation of J.C.'s clearly established constitutional rights.

161.    J.C.'s constitutional right not to be sexually abused or assaulted in prison was firmly established before the BOP rules establishing PREA-compliant mandatory procedures for handling sexual abuse cases went into effect on June 24, 2015.

162.    Wardens  Jones and Coil and Officers Proffitt,  Brown, and Pulido, failed in their respective duties to provide J.C. with constitutionally safe and secure conditions of confinement by and through their deliberate indifference to the substantial, longstanding, and obvious risk of harm posed by Highsmith.

163.    The policies, practices, acts, and omissions of Wardens  Jones and Coil and Officers Proffitt,  Brown, and Pulido, directly and proximately caused the violation of J.C.'s Eighth Amendment right to be free from sexual abuse and sexual battery while incarcerated and Plaintiff's resulting damages.

164.    Wardens  Jones and Coil and Officers Proffitt,  Brown, and Pulido directly and proximately caused the violation of J.C.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to train, supervise, and discipline FCI Tallahassee staff and employees and/or report known or suspected sexual misconduct thereby failing to adequately prevent further constitutional violations.

165. Wardens Jones and Coil and Officers Proffitt, Brown, and Pulido directly and proximately caused the violation of J.C.'s rights under the Eighth Amendment of the United States Constitution by failing to adhere to and /or ensure that FCI Tallahassee staff followed PREA-mandated policy for responding to suspected or known instances of sexual abuse at the institution, thereby failing to adequately prevent further constitutional violations.

166. Wardens Jones and Coil directly and proximately caused the violation of J.C.'s rights under the Eighth Amendment of the United States Constitution by failing to ensure the coordination of departments within the facility in preventing, detecting, intervening, and appropriately responding to sexually abusive behavior.

167. Wardens Jones and Coil, and SIS Proffitt directly and proximately caused the violation of J.C.'s rights under the Eighth Amendment of the United States Constitution by consistently failing to establish and enforce procedures for investigating and reporting disciplinary infractions so as to limit opportunities for FCI Tallahassee staff to be alone with inmates unsupervised, providing the opportunity for them to have sexual contact with or to sexually assault or rape persons in the custody of the BOP at FCI Tallahassee.

168. Officer Brown directly and proximately caused the violation of J.C.'s rights under the Eighth Amendment of the United States Constitution by failing to make such further inquiries or interventions as would be reasonable given his knowledge that Highsmith had been alone for an unknown period of time, unsupervised and unobserved, in an office with an inmate, particularly when knowing of Highsmith's sexual proclivities and past conduct respecting inmates.

169.    By their acts and omissions, Wardens Jones and Coil, and Officers Brown, Pulido, and SIS Proffitt placed J.C. in substantial risk of sexual abuse and took no effective action to protect J.C. from sexual abuse by Highsmith when they failed to *formally* report or make such further inquiries as would be reasonable given their duty to act immediately in mitigating such risk.

170.    Wardens Jones and Coil, SIS Proffitt, and Officers Brown and Pulido, engaged in a direct violation of J.C.'s constitutional rights by failing to take appropriate measures to protect J.C. and all inmates at FCI Tallahassee in the face of their actual or constructive knowledge of the risk posed by Highsmith, thereby subjecting them to substantial risk of imminent sexual abuse.

171.    The conduct of the Wardens  Jones and Coil and Officers Proffitt, Brown, and Pulido, which proximately caused J.C.'s injuries, was of such a quality and nature as to warrant each Correctional Defendant's liability for punitive damages, in accordance with applicable law.

172.    J.C. is entitled to recover from the Correctional Defendants all of her damages recognized by applicable law.

173.    All of the conduct of the respective Correctional Defendants upon which this action is based while each defendant was acting under color of law and in the scope and course of his or her position as a BOP employee and/or agent and/or representative at FCI Tallahassee.

**COUNT III**
**Federal Tort Claims Act: NEGLIGENCE**
**(United States of America)**

174.    J.C. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

175.    Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including United States Federal Correctional Institution Tallahassee.

176.    Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of Florida.

177.    Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection ... of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

178.    Defendant United States and the supervisors and employees of FCI Tallahassee have a duty to provide inmates with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

179.    As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free and safe from known sexual abusers and rapists and/or individuals who pose a foreseeable risk of sexual abuse or rape.

180.   Correctional officers and other prison officials at FCI Tallahassee have a duty to protect inmates from harm caused by correctional officers and other prison officials.

181.   Correctional officers and other prison officials at FCI Tallahassee have a duty to house inmates in a safe and secure manner.

182.   Correctional officers and other prison officials at FCI Tallahassee have a duty to protect inmates from known and obvious dangers posed by correctional officers and other prison officials.

statements to OIG and FBI investigators in contravention of the Standards of Conduct.

183.   The Correctional Defendants breached their duties to J.C. by providing and/or permitting Highsmith unrestricted and unsupervised one-on-one access to J.C. while she was incarcerated at FCI Tallahassee despite knowledge of Highsmith's past and continuing sexual abuse and harassment of female inmates

184.   Correctional officers and other prison officials at FCI Tallahassee have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

185.   Pursuant to 28 C.F.R. § 115.17(f), FCI Tallahassee and Warden Jones and Warden Coil both had a non-discretionary duty to ask Highsmith in interviews and written self-evaluations conducted as part of his performance reviews about all incidents of alleged sexual abuse by Highsmith, including but not limited to the incident described by T.D. in 2014. Upon information and belief, FCI Tallahassee and Wardens Jones and Coil breached this non-discretionary duty.

186.   Pursuant to 28 C.F.R. § 115.31, BOP and FCI Tallahassee had a non-discretionary duty to train employees on how to prevent sexual abuse and sexual

33

harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse and to ensure that such training was properly followed.  BOP and FCI Tallahassee breached this duty and such breach was a proximate cause of the injuries and damages alleged herein.

187.    Pursuant to 28 C.F.R. §§ 115.31 and 115.33, BOP and FCI Tallahassee had a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by corrections officers and to ensure that such training was properly followed.  BOP and FCI Tallahassee breached this duty and such breach was a proximate cause of the injuries and damages alleged herein.

188.    Pursuant to 28 C.F.R. § 115.17, BOP and FCI Tallahassee officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees. Those non-discretionary duties include duties to consider, with respect to hiring and promotion decisions, any incidents of sexual harassment, whether the employee has engaged in sexual abuse, and whether the employee has been convicted or civilly adjudicated of sexual abuse. Upon information and belief, with respect to Defendants who facilitated continued employment and the transfer and promotion of Highsmith, BOP and FCI Tallahassee officials failed to perform their non-discretionary duties.

189.    BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff at FCI Tallahassee in order to ensure that correctional staff

properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

190.    The Correctional Defendants breached their duties to J.C. by negligently hiring, retaining, training, managing, disciplining, reporting and supervising the BOP officers and/or other employees who tortiously injured Plaintiff during her incarceration at FCI Tallahassee, including not only Defendant Highsmith but such other officers and employees who failed to follow and enforce policies and laws, including PREA, respecting inmate safety

191.    Corrections officers and supervisors have a non-discretionary duty to report suspicion of sexual abuse by corrections officers and supervisors have a non-discretionary duty to investigate such reports and to take action with respect to substantiated reports.

192.    The Correctional Defendants breached their duties to J.C. under the Prison Rape Elimination Act (PREA) as follows:

• Section 115.11 – failing to enforce zero tolerance policy

• Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact

• Section 115.15 – permitting improper cross-gender pat downs

• Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact

• Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits

• Section 115.61 – failing to report suspicion of sexual abuse

• Section 115.67 – failing to protect inmates from retaliation after reporting abuse

• Section 115.76 – failing to discipline staff for sexual misconduct.

193.    Correctional officers at FCI Tallahassee knew that Highsmith posed an excessive and unreasonable risk to the health and safety of J.C. and that he had been sexually abusing inmates at FCI Tallahassee for years, including one instance involving the rape of T.D.  At least one of the following had to have occurred: (1) the correctional officers, as alleged above, breached their non-discretionary duty to report their direct knowledge or belief of Highsmith's sexual misconduct; (2) the supervisors failed in their non-discretionary duties to investigate and take action with respect to Highsmith specific misconduct; or, (3) corrections officers and supervisors either deliberately ignored or were carelessly inattentive with respect to the signs all around them.

194.    Prison officials at FCI Tallahassee knew or should have known that Highsmith should not have been permitted to have unsupervised access to inmates, including J.C., to whom he posed an excessive and unreasonable risk.

195.    Prison officials at FCI Tallahassee knew or should have known that Highsmith should be kept away from all inmates subsequent to the incident with T.D. and following the recent allegations involving inmate J.P., who they were aware had been sexually assaulted by Officer Highsmith, when they allowed him to guard the SHU where she was housed ostensibly for her own protection. Instead, they allowed Officer Highsmith to retain his unrestricted and unsupervised access to the population of female inmates, to include Plaintiff J.C., who Highsmith raped just over one month after J.P.

196.    The Correctional Defendants breached their duties to J.C. by providing and/or permitting Highsmith unrestricted and unsupervised one-on-one access to J.C.

while she was incarcerated at FCI Tallahassee despite knowledge of Highsmith's past and continuing sexual abuse and harassment of female inmates

197.    As a direct result of the prison officials' breaches of their non-discretionary duties or their reckless, willful, wanton and careless disregard of the obvious and known risk to inmates in improperly performing them, J.C. suffered personal injuries associated with and arising from two instances of sexual abuse and sexual assault at the hands of Highsmith.

198.    As a result of the acts and omissions upon which Plaintiff's claims against Defendant United States of America are grounded, Plaintiff suffered severe physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

199.    J.C. is entitled to recover from Defendant United States of America all of her damages recognized by applicable law.

## COUNT IV
## Federal Tort Claims Act: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (United States of America)

200.    J.C. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

201.    Highsmith, acting within the course and scope of his employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of J.C., through unwanted, non-consensual sexual abuse, sexual assault, and harassment as defined in section 115.6 of PREA.

202.   Highsmith's conduct as described herein was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Plaintiffs, and (4) severe and damaging.

203.   As a direct and proximate cause of the intentional infliction of emotional distress specified herein, Highsmith caused damage to J.C. including psychological trauma, emotional distress, depression, physical trauma and pain and suffering.

204.   J.C. is entitled to damages from the United States of America under the Federal Tort Claims Act for the intentional infliction of emotional distress committed by Highsmith in an amount to be determined at trial.

## COUNT V
## NEGLIGENCE
## (Nakamoto Group, Inc.)

205.   J.C. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

206.   As mandated by PREA, the BOP conducts PREA audits at each federal prison facility once every three years. At all times relevant to this complaint, PREA audits for all BOP facilities were conducted by Nakamoto.

207.   The primary purpose of the onsite phase of the PREA audit inspection is to assess the day-to-day practices used by facility staff to promote sexual safety and to prevent rape in prison.  During the onsite phase of a PREA audit, auditors are supposed to conduct a thorough examination of the entire facility, observe routine activities, interview staff and inmates, and review and retain key documents maintained by the facility.

208.   During the "onsite review" component of an audit, PREA compliance auditors are required to spend a number of days (usually three) at the facility conducting a site inspection and conducting interviews with both executive and rank-and-file staff and inmates randomly selected by the auditor during the site visit, or inmates previously identified by the facility as being fairly representative of a number of inmate social categories, such as: youthful inmates, inmates with limited English language proficiency and transgender inmates.  Finally, PREA audits are supposed to involve a careful process of documentation selection and review. These core components form the foundation of a practice-based audit methodology.

209.   Prior to going onsite to a facility, Nakamoto failed to conduct a broad internet search on the audited facility to determine if there was any relevant information that might have shed light on the culture and history of the facility such as recent budgetary or staffing changes, legal action against the facility, press clippings, and other information that might inform the audit or if Nakamoto did conduct such a search it ignored the readily available information regarding longstanding and ongoing sexual misconduct at FCI Tallahassee.

210.   PREA Standard 115.401(h) states, that all auditors "[shall] have access to, and shall observe, all areas of the audited facilities." In order to meet the requirements in this Standard, the site review portion of the onsite audit must include a thorough examination of the entire facility.

211.   Nakamoto was required to be critically engaged with critical facility functions including but not limited to intake and risk screening; activity in the housing units; bathroom and shower procedures; staffing ratios; cameras and surveillance

technology deployment and use; access to reporting entities; and supervision practices at FCI Tallahassee.

212.    Nakamoto consistently failed to conduct thorough examinations of critical facility functions FCI Tallahassee.

213.    Nakamoto was required to review internal records at FCI Tallahassee as part of the auditing process, including but not limited to background check records; supervisory rounds logs; risk screening and intake processing records; medical files; and investigative files—including a review of a representative sample of each type of record.

214.    Nakamoto failed to review appropriate records and/or failed to note discrepancies, irregularities or problems that should have been readily apparent from the well known activities of Highsmith and/or other staff at FCI Tallahassee.

215.    The systemic deficiencies in Nakamoto's inspections of FCI Tallahassee by failing to identify and address obvious signs of endemic sexual abuse at the facility was a proximate cause of the injuries and damages suffered by J.C. and other female inmates at FCI Tallahassee.

216.    Nakamoto failed to use reasonable care and diligence to hire, train, and supervise its auditor staff to obtain sufficient facts to support all statements, conclusions, and findings of the audits performed at FCI Tallahassee.

## COUNT VI
## BREACH OF CONTRACT
## (Nakamoto Group, Inc.)

217.    J.C. re-alleges and incorporates by reference all for the preceding allegations set forth herein.

218.    Nakamoto Group, Inc. (Nakamoto) operates as an SBA 8(a) Program minority business which, because of such status, receives certain preferential treatment in applying for and receiving bids on Federal government contacts.

219.    After having received federal contracts in unrelated areas of government work, Nakamoto entered into various contracts with the United States to perform audits of detention facilities (e.g., ICE facilities on the U.S. border) and to perform Prison Rape Elimination Act (PREA) audits of Bureau of Prisons correctional facilities.

220.    As a part of the aforementioned contracting process, Nakamoto had a contract to perform PREA audits at FCI Tallahassee.

221.    Upon information and belief, the contract regarding PREA audits for BOP correctional facilities, including FCI Tallahassee, have paid Nakamoto by way of consideration large sums of money measured in the millions of dollars.

222.    The purpose of the Prison Rape Elimination Act (PREA) auditing function, which the contract with Nakamoto was to provide for the BOP, was to ensure compliance with the mandates of the Prison Rape Elimination Act (PREA) 34 U.S. Code § 30301.

223.    The purpose of the Act is to "provide for the analysis of the incidence and effect of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape."

224.    J.C. at all times relevant to the allegations herein was and she remains a federal inmate and thus an individual to be protected "from prison rape."

225.    J.C. is an individual for whom the PREA auditing function was designed to protect.

226.    The intent and/or purpose of the contract between Nakamoto and the BOP either as expressed by the parties, or in the provisions of the contract, was that the contract primarily and directly was to benefit inmates such as J.C.

227.    Nakamoto breached the contract by failing to conduct appropriate and meaningful PREA audits and to make appropriate and meaningful reports which would have provided the BOP with the necessary information to take corrective action to not only fulfill the purpose of PREA "to protect individuals from prison rape" but to also help fulfill their mandated duty to  "provide for the safekeeping, care, ... of all persons charged with or convicted of offenses against the united states" and to "provide for the protection ... Of all persons charged with or convicted of offenses against the united states." under 18 U.S.C. § 4042(a)(2)-(3).

228.    As a direct and proximate result of Nakamoto's the breach of the contract between Nakamoto and the BOP, J.C. was injured and damaged as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1.  Compensatory damages as to all Counts;

2.  Punitive damages as to all counts excepting Counts III and IV against the United States of America under the FTCA;

3.  Reasonable attorneys' fees and costs in accordance with applicable law; and,

4.  Such other further relief as this Court deems just.

Plaintiff hereby demands a jury trial on all Counts so triable under applicable law.

**J.C.,**
Plaintiff

*/s/ Steven R. Andrews*
STEVEN R. ANDREWS (FBN 0263680)
RYAN J. ANDREWS (FBN 104703)
The Andrews Law Firm
822 N Monroe St
Tallahassee, FL 32303
P: (850) 681-6416
*ryan@andrewslaw.com*

*/s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB# 2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*s/L. Dante diTrapano*
L. Danté diTrapano, Esq. (WVSB# 6778)
Calwell Luce diTrapano, PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
Benjamin Adams, Esq. (WSB# 11454)
badams@cldlaw.com
Alex McLaughlin, Esq. (WVSB# 9696)
amclaughlin@cldlaw.com

*s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB# 5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com